688 P.2d 367 (1984)
297 Or. 464
STATE of Oregon, ex rel. John Sajo, Frederick J. Oerther, Sandee Burbank, and Greg Mihalik, Plaintiff-Relators,
v.
Norma PAULUS, Secretary of State for the State of Oregon, Julia Woods, Baker County Clerk, Daniel G. Burk, Benton County Clerk, Juanita N. Orr, Clackamas County Clerk, Norma Hunsinger, Clatsop County Clerk, Reta C. Kerry, Columbia County Clerk, Mary Ann Wilson, Coos County Clerk, Eugene P. Baumann, Curry County Clerk, Mary Sue Penhollow, Deschutes County Clerk, Doris L. Wadsworth, Douglas County Clerk, L.G. Sheirborn, Hood River County Clerk, Kathy Beckett, Jackson County Clerk, Elaine L. Henderson, Jefferson County Clerk, Georgette Brown, Josephine County Clerk, Evelyn Biehn, Klamath County Clerk, Karen O'Connor, Lake County Clerk, Jeff Fax, Lane County Finance and Management Services Director, Gloria McEwen, Lincoln County Clerk, Del Riley, Linn County Clerk, Alan H. Davidson, Marion County Clerk, Vicki Ervin, Multnomah County Clerk, Violet Siddal Starks, Polk County Clerk, Linda Cornie, Sherman County Clerk, June Wagner, Tillamook County Clerk, J. Dean Fouquette Sr., Umatilla County Clerk, Shirley L. Bolin, Union County Clerk, Sue A. Proffitt, Wasco County Clerk, Michael Cox, Washington County Clerk, Charles Stern, Yamhill County Clerk, Defendants.
SC S31039.
Supreme Court of Oregon, In Banc.
Argued and Submitted August 24, 1984.
Decided August 29, 1984.
*369 Michael Rose, Milwaukie, and Alan Silber, New York City, argued the cause for plaintiff-relators. Michael Rose, and Stern & Rose, Milwaukie, filed memoranda of law, for plaintiff-relators.
William Gary, Deputy Atty. Gen., Salem, argued the cause, for defendant Secretary of State.
John B. Leahy, County Counsel for Multnomah County, Portland, and Paul Snider, Legal Counsel, Ass'n of Oregon Counties, Salem, argued the cause, for defendant counties.
Thomas A. Balmer, Portland, filed a brief, amicus curiae on behalf of the American Civil Liberties Union of Oregon, Inc.
ROBERTS, Justice.
This is a mandamus proceeding of which this court took original jurisdiction under the Oregon Constitution, article VII, section 2 and ORS 34.120. Petitioners are proponents of an initiative measure, referred to as the Oregon Marijuana Initiative. Defendants are the Secretary of State and 28 county clerks from throughout the state. Petitioners allege that the defendants failed to follow proper signature verification procedures with respect to their initiative. These allegedly improper procedures led to the disqualification of a number of petition signers, which number, when applied in the Secretary of State's predictive sampling formula, indicated that the total number of probable verifiable signatures fell below the necessary number of verified signatures required for placement on the ballot. As a result, the Secretary of State refused to place the initiative on the ballot.

I
We allowed the alternative writ in this case because of the importance and the novelty of the statutory and constitutional issues raised by the petition. This does not mean, however, that a petition invoking this court's extraordinary and discretionary jurisdiction under article VII, section 2 of the Oregon Constitution will in the future be regarded as the accepted and proper way to secure judicial review of decisions of the Secretary of State under the election laws.
The statutes in fact prescribe at least one procedure for such judicial review. ORS 246.910(1) provides:

*370 "A person adversely affected by any act or failure to act by the Secretary of State or a county clerk under any election law, or by any order, rule, directive or instruction made by the Secretary of State or a county clerk under any election law, may appeal therefrom to the circuit court for the county in which the act or failure to act occurred or in which the order, rule, directive or instruction was made."
However, under subsection (4) of the same section this remedy expressly does not exclude other remedies.
"The remedy provided in this section is cumulative and does not exclude any other remedy against any act or failure to act by the Secretary of State or a county clerk under any election law or against any order, rule, directive or instruction made by the Secretary of State or a county clerk under any election law."
Also, it is possible that under some circumstances, a decision under the election laws, such as a decision on the eligibility of a voter or of a petition for an initiative or referendum, may be an order in a contested case under ORS 183.310(2)(a) and reviewable under ORS 183.482, or an order not in a contested case under ORS 183.310(5) and reviewable under ORS 183.484. If so, review under ORS 246.910(4) again does not exclude such other prescribed remedy. The applicability of these other statutes is not before us and we do not decide it.[1]
A writ of mandamus is one of the other remedies not excluded by ORS 246.910, although the statutory writ "shall not be issued in any case where there is a plain, speedy, and adequate remedy in the ordinary course of the law." ORS 34.110. Whether the ordinary remedy is "speedy" depends on the remedy and whether it can be expedited as readily as can the proceeding in mandamus. The time required for appeals is not a factor, because the decision of a circuit court (or the Court of Appeals) is a judicial decision on the merits of the parties' legal claims; they are not entitled by right to a decision of this court.[2]
As we have stated, however, we considered the issues in this case to be of sufficient public importance for the initiative process to deserve this court's resolution for such guidance as one decision can give the responsible officials and the legislature. We therefore turn to those issues.

II
We first review the laws relevant to this case.

A. Verification of Signatures

The Oregon Constitution sets forth the requirements for the initiative process. Oregon Constitution, article IV, section 1(4)(a) provides:
"Petitions or orders for the initiative or referendum shall be filed with the Secretary of State. Signatures of qualified voters on an initiative or referendum petition filed with the Secretary of State that have not been verified before the filing of the petition may be verified thereafter, but signatures not verified within the 15-day period after the last day on which the petition may be filed * * * shall not be counted."
Article IV, section 1 contemplates that the bulk of the signatures will be verified before filing with the Secretary of State. *371 The text clearly regards the Secretary of State's 15 day post-filing verification process as the exception, in order to accommodate later signatures which could not be verified prior to filing.
Prior to amendment in 1968, the constitution specified no post-filing verification procedure. Statutes implementing the former constitutional provision required the Secretary of State to count only those signatures verified by county clerks before the petition was filed with the Secretary of State. ORS 254.040, Or. Laws 1965. This statute also imposed on county clerks the obligation to maintain a verification schedule of 200 signatures per day. In Kays v. McCall, 244 Or. 361, 418 P.2d 511 (1966), we held that signatures not verified by the county clerks as of the filing deadline would not be counted for purposes of determining whether the requisite number of signatures of legal voters appeared on the petition signature sheets. This provided an impetus for statutory and constitutional amendments. Article IV, section 1 now allows an additional period for verification of signatures by the Secretary of State within the 15 days following filing. Signatures not verified within this period may not be counted.
The verification process itself is regulated by statute. As counsel for defendant Secretary of State describes it, the signature verification process now does not begin until the petition is filed with the Secretary of State. Then the entire signature verification process takes place within the 15 day period following filing.[3] Article IV, *372 section 1(4)(b) contemplates the passage of laws to implement the provisions of section 1. ORS 250.105 directs the Secretary of State to designate by rule a statistical sampling technique to be used in the verification procedure. The Secretary of State has done so in OAR 165-14-030. By means of this sampling procedure, only a portion of the signatures are actually verified. By applying the statistical formula, the probable number of all valid signatures can be extrapolated.[4] The sampling technique was applied in this case.
We do not suggest that the Secretary of State exceeded her authority when she established a verification process for the 15 day post-filing period. We note, however, that the substitution of sampling for actual verification provided in ORS 250.105 cannot be justified by the exigencies of attempting to compress the verification into the post-filing period. As we have pointed out above, the constitution presupposes that most signatures on petitions will be verified before they are filed. Signatures that have not been verified before the filing "may" be verified thereafter, but not later than 15 days after the deadline for filing petitions. Obviously the drafters of the 1968 amendment would not have used the verb "may" for this post-filing verification if they had not assumed that ordinarily the signatures would be verified before filing. They did not assume that there would be no way to secure verification before filing.
The constitution does not expressly define verification or prescribe how and by whom signatures are to be "verified." Article IV, section 1(4)(b). The legislature was left free to allocate the responsibility among the persons submitting a petition, the county clerks, the Secretary of State, or perhaps other officials. Statistical sampling may be used by the Secretary of State in determining whether the proportion of valid signatures submitted will exceed or fall short of the required number by such a wide margin that the result of individual verification cannot be in question. But statistical sampling cannot foreclose a procedure that lets persons who circulate petitions (or those who oppose the petitions) secure actual pre-filing verification of signatures that are submitted sufficiently in advance of the deadline to make individual verification possible.[5]

*373 B. Qualified voters

Article IV, section 1(2)(b) requires petitions to be signed by "qualified voters." Eligibility to vote in elections is defined in Oregon Constitution, article II, section 2:
"(1) Every citizen of the United States is entitled to vote in all elections not otherwise provided for by this Constitution if such citizen:
"(a) Is 18 years of age or older;
"(b) Has resided in this state during the six months immediately preceding the election, except that provision may be made by law to permit a person who has resided in this state less than 30 days immediately preceding the election, but who is otherwise qualified under this subsection, to vote in the election for candidates for nomination or election for President or Vice President or elector of President and Vice President of the United States; and
"(c) Is registered prior to the election in the manner provided by law."
The legislature has defined by statute the manner by which voters must be registered. ORS 247.009-247.201. Under ORS 247.012(3) registration occurs when "a legible, accurate and complete registration card is received in the office of the county clerk for the county in which the person resides * * *." Registration may take place at any time "before the poll closes." ORS 247.025.
There is an obvious question how the qualification of one who signs a petition for an initiative or referendum can be "verified" for purposes of article IV, section 1(4)(a) when one of the requirements set forth in article II, section 2, the requirement of registration as a voter, can be satisfied until the date of the election. We note, however, that the apparent incongruity arises only from the statutes, not from the two constitutional provisions themselves. Article II, section 2 neither requires nor defines registration of otherwise qualified voters; it leaves this to be provided by law. Article IV, section 1(2)(b) refers to "qualified voters," which certainly makes eligibility under article II, section 2 a necessary condition for validly signing a petition. But this eligibility to vote on election day may not necessarily be a sufficient condition for signing a petition, because article IV, section 1(4)(a) clearly contemplates that eligibility as a "qualified voter" can be verified before the petition is filed. And article IV, section 1(4)(b) authorizes the submission of initiative and referendum measures to be regulated by laws consistent with this contemplated verification.
The legislature has provided that "[a]ny elector may sign an initiative or referendum petition for any measure on which the elector is entitled to vote." ORS 250.025. One of the questions to be discussed below, therefore, is how this statute relates to the previously quoted statute that permits registration anytime before the poll closes.

III
Petitioners challenge certain decisions of the defendants regarding the qualifications of voters. Defendants' authority to examine voter qualifications is defined by statute. Statutes assign to the Secretary of State the authority to receive petitions and orders for initiatives and referendums and to verify signatures. ORS 250.105(1) provides: "An initiative or referendum petition relating to a state measure shall be filed with the Secretary of State for signature verification." ORS 246.110 declares the Secretary of State to be the "chief election officer of this state" with responsibility to "obtain and maintain uniformity in the application, operation and interpretation of the election laws." In order to carry out this responsibility, ORS 246.120 provides: "[T]he Secretary of State shall prepare and distribute to each county clerk detailed and comprehensive written directives * * * on registration of electors and election procedures which are under the direction and control of the county clerk." The same statute mandates: "A county clerk affected *374 thereby shall comply with the directives or instructions."[6] In addition, under ORS 246.150, the Secretary of State "may adopt rules the secretary considers necessary to facilitate and assist in achieving and maintaining a maximum degree of correctness, impartiality and efficiency in administration of the election laws * * *."
Pursuant to these sources of authority, the Secretary of State has published instructions regarding the initiative process. The parties call our attention to two such publications, one entitled Directive # 1977-15, dated November 24, 1981, and the other referred to by the parties as "the manual" which bears the title "Initiative, Referendum and Recall."[7]
Petitioners claim that the county clerks and the Secretary of State made errors of fact in failing to verify certain signatures. Petitioners also assert legal error arguing that some signer disqualifications violated applicable statutes and constitutional provisions and others involved disregard or misinterpretation of the Directive and portions of the manual. We address only the legal questions.
Petitioners allege six legal errors in the disqualification of petition signers. First, petitioners challenge the disqualification of 108 signers who signed on petition signature sheets designated for a county other than the county in which the signers resided. Second, petitioners contest the disqualification of 55 signers for a variance between their addresses as they appear on the petition and as recorded on their registration cards. Third, petitioners claim that 34 signers were erroneously disqualified because they were registered at the time of signing but not at the time of verification. Fourth, petitioners contend that 76 signers who were not registered at the time they signed but who later registered were wrongfully disqualified. Fifth, petitioners assert that three signers should not have been disqualified because they changed their names between the time of signing and verification. Sixth, petitioners argue that 10 crossed off names or blank lines on the petition sheets were improperly included in the sample as disqualified petition signers.

A. Residency

Petitioners assert that no authority exists under which the Secretary of State and the county clerks could disqualify signers who signed on a petition sheet designated for a county other than their county of residence. Petitioners argue that the Secretary of State must attempt to verify these signatures with the clerk of the county of residence and disqualify them only if the signatures cannot there be verified. Defendants rely on a provision in the manual which they contend requires signing on the correct county sheet as a prerequisite to signer verification.
Under the caption "Circulation of Petitions," the manual provides: "All signers on any one signature sheet should be registered to vote in the same county. If a circulator fails to observe this instruction, a number of otherwise valid signatures may not be counted in the verification process." At 7. The procedures set forth throughout the manual are directed to citizens initiating a petition, the Secretary of State, county clerks, or others who may be involved in the process of initiative, referendum and recall. The tasks undertaken by various persons in the processing of a petition are designated either as a duty the responsible person "must" or "shall" perform or as a procedure the person "should" or "may" follow. In the section at issue, for example, *375 there are certain requirements which "must" be met: "All signatures on the petition must be signatures of electors of the state." "All petition circulators must be electors of the state." Other procedures are phrased in permissive language: "Chief petitioners should review with all circulators of a petition the legal prohibitions and guidelines as set forth in ORS 260.555 through 260.585, for obtaining signatures on the petition." One procedure is clearly a suggestion only: "It is suggested that no more than five signature sheets be attached to any one cover sheet for proper circulation." (Emphasis in original.)
The language upon which defendants rely to disqualify signers appears to be a warning to circulators to monitor petition signing with attention to maintaining a separation of signers by county, no doubt precipitated by the perceived need for a speedy signature verification process. It is not drafted in mandatory terms, however. Therefore, unless the Secretary of State provides that a particular requirement must be met in all cases before a voter qualifies as a petition signer, the verifying officials may not later disqualify a signature on that basis.[8]

B. Change of Address

Petitioners contend that the county clerks disqualified 55 initiative petition signers because the address on the petition varied from the address on the registration card. The Secretary of State takes no position on whether an address variance alone should invalidate petition signatures. Petitioners cite an Attorney General Opinion, AGO 6534, September 28, 1967, in which the question was asked by the Secretary of State:
"Must the residence address of a petition signer be identical to the residence address entered on his registration card in order to have his signature counted as genuine on an initiative or referendum petition?"
The Attorney General replied:
"We do not believe that the legislature intended either that voters could be disenfranchised in failing to have their names counted on an initiative petition where they merely stated their address incorrectly or moved and reregistered after signing the petition, nor do we believe that the legislature, in order to avoid this result, intended to place upon the county clerk the burden of investigating each case where the address stated is different from that of the voter's registration.
"We therefore conclude that the county clerk in checking signatures on initiative petitions may not refuse to count a signature simply because his residence as listed on the petition differs from that appearing on the signer's registration card."
The defendant Secretary of State points out that this opinion was based on former ORS 254.040 which was repealed in 1973. We find nothing in that legislative enactment or any subsequently enacted legislation to indicate the legislature intended to change the law on this point.[9]
We agree with the Attorney General's observation that a person may have more than one residence or that a voter, when signing a petition, may be at that time stating his voting residence with full accuracy as it then appears on the registration records but may, before the petition is presented to the county clerk for checking, move to a new address and change his registration accordingly. As the Attorney *376 General's Opinion states: "In such event, to say that the county clerk may disregard the signature would be to disenfranchise a voter who has at all times properly maintained his registration." The 55 signatures should not have been invalidated for the reason that the address on the petition was not the same as the address on the registration card.

C. Purged Registrations

Petitioners claim the county clerk erroneously declared invalid the signatures of 34 persons who were registered at the time the petition was signed but whose names had subsequently been removed from the active voter files.
ORS 250.025 provides: "Any elector may sign an initiative or referendum petition for any measure on which the elector is entitled to vote." Under Article II, section 2 of the Oregon Constitution a person becomes a qualified elector if he is a citizen of the United States, is 18 years of age or older, meets the residency requirement and "[i]s registered prior to the election in the manner provided by law." If he is a qualified elector at the time of signing the petition, the signature is not invalid because his name may later be removed from the active voter file.
Defendant Secretary of State takes no position on this issue except to point out that county clerks would have to check the file of purged voter registration cards to determine whether a particular individual's registration card had been purged subsequent to the signing of the petition. She argues that this would significantly delay the verification process. That may be true, but the statutory and constitutional provisions cannot be avoided for the sake of speed and efficiency. The signatures of the 34 persons who were registered at the time the petition was signed but whose names had subsequently been removed from the active voter files should not have been invalidated for that reason.

D. Registration after Signing

Petitioners next claim that the county clerks erroneously declared invalid the signatures of 76 people who registered to vote after signing the petition but before the petition was filed. Fifteen of the disqualified signers in this category registered on the same day they signed the petition. The county clerks invalidated the signatures in accordance with the Secretary of State's Directive # 1977-15, which states in part:
"If the date of signing indicated on the petition signature sheet precedes the date of registration as defined in ORS 247.012(3), the signature shall not be counted." (Emphasis added.)
Article IV, section 1 of the Oregon Constitution requires that an initiative petition be signed by a certain number of "qualified voters." Article II, section 2 of the Oregon Constitution sets out the requirements of a "qualified voter" including the requirement that the voter be "registered prior to the election in the manner provided by law." ORS 247.025 states: "A person, to vote in an election, must be registered before the poll closes." Petitioners assert that any petition signer who registers within the statutory period, or at least prior to verification cannot be disqualified.
The qualifications for petition signers are set forth at ORS 250.025. That statute provides: "Any elector may sign an initiative or referendum petition for any measure on which the elector is entitled to vote." (Emphasis added.) The statute and article IV, section 1(2)(b) contemplate that petition signers will be qualified voters at the time they sign the petition. ORS 250.045(7) requires circulators to verify on each signature sheet that every person who signed the sheet did so in the presence of the circulator and that the circulator believes each individual is an elector. The purpose of the petition process is to gather the signatures of eligible voters in sufficient number to present the measure in an election forum. As we read these statutes, eligibility to vote is a requirement that must exist at the time a voter signs a petition. Defendants did not err when they disqualified signatures on this basis.
*377 With regard to the 15 signers who registered the same day, petitioners indicate in their pleadings that these signers registered after they signed. In their memorandum they state that these signers registered and signed at the same time. It appears from the memorandum that the petition signers may have filled out registration cards at the same time they signed the petition. A voter is not registered, however, until "a legible, accurate and complete registration card is received in the office of the county clerk for the county in which the person resides * * *." ORS 247.012(3). Petitioners make no claim that the registration cards were received the same day. It appears, therefore, that these 15 signers were properly disqualified.

E. Name Changes

Petitioners final claim is that county clerks erroneously declared invalid three qualified voters who signed the petition and then changed their names under law. As a result of the name change, the name on the petition was different than the name on the registration card at the time of verification. A name change does not alter a person's voter registration status. Although the name differences may cause practical problems for the county clerks, the fact remains that the signer of the petition was a qualified voter.

F. Crossed off Signatures and Blank Lines

The Secretary of State is alleged to have included in the sample as disqualified signatures ten blank or crossed off signature lines. This would be improper. Inclusion of these lines in the sample as though they were unverified signatures would distort the estimate of probable verified signatures.

IV
We allowed the alternative writ commanding the Secretary of State to place the initiative on the ballot or to show cause why she should not, and commanding all the defendants either to verify the sample of signatures or verify all the signatures and place the initiative on the ballot if the recount yields sufficient signatures, or show cause why they should not. A peremptory writ will issue. The defendants are ordered to proceed immediately to count and verify the sample of signatures submitted, correcting any errors previously made, and if the sampling process yields a sufficient number of signatures, the Secretary of State for the State of Oregon, shall place the Oregon Marijuana Initiative on the 1984 General Election Ballot.
APPENDIX
SAMPLING FORMULA
Steps to calculate limits for acceptance and rejection of petition, based on a sampling of n signatures.
Let: N = total number of signatures submitted.
M = estimated total number of valid signatures submitted.
n = number of signatures checked.
R = required number of valid signatures.
Z[a] = 2.58, a factor used to give a probability of .005 of rejecting a valid petition.
Z[b] = 1.645, a factor used to give a probability of .05 of accepting a non-valid petition.
a = number of valid signatures below which petition would be rejected.
b = number of valid signatures required for petition to be accepted.
p = proportion of sampled signatures verified.
d = proportion signatures assumed to be duplicates.
The estimate of the total number of valid signatures submitted is given by
M = (p-d)N
If from a sample size of n = 3,000 from N = 64,000 signatures submitted, 2,700 signatures are verified and two percent are assumed to be duplicated,
2700 p = ____ = .90 3000
*378 and N R R n M = (.90 - .02) 64,000 = 56,320 a = R - _ Z[a] &check; _ (1 - _) (1 - _) &check; n N N N
The lower limit, for rejection, is given by _ _ | R = 53,312 | | z[a] = 2.58 | | | n 3,000 R If are given and p = .90; _ = ______ = .05; _ | | N 64,000 N | n = 3,000 | | N = 64,000 | _ _
53,312 = ______ = .89 60,000
64,000 a = 53,312 - ______ (2.58) &check; .89 (1 - .89) (1 - .05) &check; 3,000
64,000 = 53,312 - ______ (2.58) (.305) 54.77
= 53,312 - 920 = 52,392 ======
The upper limit, for acceptance, is given by

N R R n
b = R + _ z[b] &check; _ (1 - _) (1 - _) (Where z[b] = 1.645)
&check; n N N N
64,000
b = 53,312 + ______ (1.645) &check; .89 (1 - .89) (1 - .05)
3,000
64,000
= 53,312 + ______ (1.645) (.305)
54.77
= 53,312 + 586 = 53,898
======

The value of M = 56,320 is above b = 53,898; therefore, the petition is accepted.
PETERSON, Chief Justice, concurring.
I do not agree with part IIA of the opinion.
Article IV, section 1(4)(b) of the Constitution of Oregon provides:
"Initiative and referendum measures shall be submitted to the people as provided in this section and by law not inconsistent therewith."
The legislature has passed a law to implement section 1(4)(b). ORS 250.105(3) provides:
"The Secretary of State by rule shall designate a statistical sampling technique to verify signatures of an initiative or referendum petition. The secretary may employ professional assistance to determine the sampling technique."
The Secretary of State has promulgated a rule, OAR 165-14-030, which provides that the Secretary of State "reserves the right to designate that any petition or part of any petition have all the signatures verified [by a statistical sampling approach]."
I read the majority opinion to hold (in the last sentence of Part IIA) that that regulation is impermissible, that the Secretary of State must afford some method to "secure actual pre-filing verification of signatures that are submitted sufficiently in advance of the deadline to make individual verification possible."
That question is not presented in this case, and has not been argued. It is an important question. The statutes are silent as to a method of pre-filing verification.
Though I might agree with the conclusion of Part IIA were the question presented, I disengage myself from the holding. We should only decide questions that are presented for decision.
CARSON and JONES, JJ., join in this concurring opinion.
NOTES
[1] We do not decide, for instance, what due process under the federal fourteenth amendment may require for purposes of ORS 183.310(2)(a)(A), in light of the importance of the rights at issue, the time available for a decision, and the possibility in close cases of putting a measure on the ballot by the deadline, subject to the qualification that votes cast on it will not be counted if the unfinished review proves the measure to be ineligible.

Because the effect of today's decision is to order the Secretary of State to make a new determination, it is possible that this determination will involve disputed facts. If so, the Secretary of State may consider whether it is administratively and legally possible to make the determination on an administrative record adequate for judicial review under the appropriate statute without requiring a reviewing court to take evidence and find facts anew.
[2] Also, an appeal that seems to require decision by this court can be certified to us by the Court of Appeals under ORS 19.210.
[3] OAR 165-14-030 describes how the Secretary of State verifies signatures applying a statistical sampling formula:

"This rule is adopted to implement Oregon Revised Statute 254.042(6) and presumes that all requirements for petition filing have been met and that the petition signature sheets, as presented, are accepted for checking. Also, for the purpose of insuring the uniform and accurate application of administrative rule, the office of the Secretary of State reserves the right to designate that any petition or part of any petition have all the signatures verified:
"(1) The petition signature sheets are separated into stacks representing individual counties.
"(2) The signature sheets in each county stack are identified and the signature totals are recorded by:
"(a) Each county stack of signature sheets is assigned a serial number starting with 0001 for the first sheet of that county with each succeeding sheet given a number one higher than the previous;
"(b) As the serial number is assigned to each signature sheet the petition I.D. number, county number, page serial number, the signature line number, of the last signature line to be used and the number of blanks or crossed out lines is recorded on a separate log sheet. The total number of signatures for the county can be totaled at this point by adding the signature line count and subtracting the blank or crossed out line count that has been recorded on the log sheet.
"(3) The log sheet data are converted to computer readable form. The information captured is as follows: (1 digit) petition I.D. number, (2 digit) county number, (5 digit) serial number, (2 digit) line number, (2 digit) blank or cross out count.
"(4) The county totals of unverified signatures are added together to get a total petition signature count. If the petition contains enough unverified signatures to meet the statutory requirements it is accepted for checking. If the petition does not have enough unverified signatures to meet the statutory requirements the petition is rejected. The total count of unverified signatures for this petition and the sample size of at least 5% or up to approximately 3,000 names, are supplied to a random number generator program. The sample size percentage may vary so that in the estimate of the Secretary of State a reasonable reliability is maintained. * * * This random number generator program supplies a random number list, which is applied against the log sheet data; also, a random sampling selection list is printed. This list contains the petition I.D. number, county number, the serial number and line number of each sampling signature and will show the number of signatures sampled, by county, and will serve as a control for the mailing out and checking in of the sampling signature sheets.
"(5) Using the random sampling selection list as the control element the appropriate signature sheets are pulled from the county stacks. The selected sampling signature will be highlighted for identification purposes.
"(6) The selected signature sheets along with a `SUMMARY OF RESULTS OF VERIFICATION' sheet is sent to the applicable county.
"(7) Upon receipt of the selected signature sheet(s) the county clerk will immediately begin verifying the signatures. The results of the signature verification are posted to the `SUMMARY OF RESULTS OF VERIFICATION' sheet. As soon as all signatures have been checked and the results posted the clerk returns the sample signature sheet(s) and the completed `SUMMARY OF RESULTS OF VERIFICATION.'
"(8) When this office receives the sample signature sheets and `SUMMARY OF RESULTS OF VERIFICATION' from the county they are checked against the random sampling selection list for that county. This is to insure that all sample signatures were checked and returned and that the summary of results will crossfoot to the original sampling signature county. When all counties have returned their sampling signatures and they have been checked in and crossfooted the results will be consolidated.
"(9) The consolidated result from the sample is applied to the sampling formula * * *. The formula will show that:
"(a) Petition has a sufficient number of valid signatures and is perfected.
"(b) The petition does not have sufficient number of valid signatures and, therefore, fails."
OAR 165-14-030 was adopted to implement ORS 254.042(6), which was subsequently repealed. Or. Laws 1979, ch. 190, § 431. Although ORS 250.105(3) provides the Secretary of State with the authority to make rules designating a statistical sampling technique for signature verification, OAR 165-14-030 has not been amended to reflect this change in its statutory authorization.
[4] The formula is referred to in OAR 165-14-030 and is set forth in an appendix to this opinion.
[5] In the short time available for this proceeding and in the absence of a record, defendants' counsel could not tell us how wide a band the formula leaves open between the statistical estimate that will lead to qualification and the estimate that will lead to disqualification, or what the Secretary of State would do if a sample fell within that band. Nor were we informed whether there is any empirical basis for estimating the number of duplicate signatures at two percent irrespective of the nature of different measures and their various constituencies. We do not know why the formula apparently is satisfied with one-tenth the degree of accuracy for accepting petitions as for rejecting them; measures may not be placed on the ballot with insufficient signatures any more than they may be rejected with sufficient signatures. Whether this or another formula will prove the presence or absence of the required number of valid signatures with the accuracy requisite to show that one or another measure clearly has received or failed to receive enough signatures, is itself a question of fact.
[6] The Secretary of State is empowered to compel the clerks' compliance by writ of mandamus procedure. ORS 246.820.
[7] In addition, the Secretary of State has promulgated administrative rules. OAR 165-14-005, provides: "The Secretary of State hereby adopts by reference the manual setting forth procedures and guidelines for initiative, referendum and recall." This rule does not disclose whether the manual it purports to adopt by reference is the same as it was when OAR 165-14-005 was adopted or whether it is the same as that upon which the parties rely in this case. Nor does the rule indicate the procedures by which the manual was adopted. Whether the manual properly has the effect of a binding rule need not be addressed here.
[8] Even with mandatory language, a challenge would remain concerning whether an administrative rule requiring collection of signatures county by county comports with the statutory and constitutional standards.
[9] We place no significance on the repeal in the context of the issue before us in view of the fact that former ORS 254.040 provided for verification of the signatures on the petition by the person circulating the petition and for the manner of verification of the signatures by the county clerk of each county. The 1973 enactment retained the provision for verification of the signatures by the person circulating the petition but provided for the statistical sampling technique for the verification of signatures by county clerks for initiative, referendum or recall petitions. Or. Laws 1973, ch. 392.