Argued and submitted September 9, judgment of trial court affirmed
September 24, 1986

ELLIS et al,
*Appellants,*

*v.*

ROBERTS et al,
*Respondents.*

(TC 86C-11483; CA A41175; SC S33173)

725 P2d 886

Robert D. Durham, Portland, argued the cause and filed the brief for appellants. With him on the brief was Kulongoski, Durham, Drummonds & Colombo, Portland.

Michael D. Reynolds, Assistant Attorney General, Salem, argued the cause and filed the brief for respondents Barbara Roberts and Dave Frohnmayer. With him on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Jan Wyers, Portland, and Margie Hendriksen, Eugene, argued the cause and filed the brief *pro se* and on behalf of the respondent Morton Wolverton.

GILLETTE, J.

## GILLETTE, J.

This is an action brought under both the declaratory judgments act, ORS 28.010 *et seq*, and ORS 246.910(1).[1] Plaintiffs are two Oregon residents and registered voters whose more particular interest in this controversy will be detailed below. Defendant Roberts is the Secretary of State. Defendant Frohnmayer is the Attorney General and principal legal adviser to the Secretary of State concerning her duties under the state election laws. Defendants Wolverton, Wyers and Hendricksen are the principal sponsors of Ballot Measure 11, which the Secretary of State has certified for placement on the November 4, 1986, general election ballot. Plaintiffs claim that Ballot Measure 11 violates the "one subject only" clause in Oregon Constitution, Article IV, section 1(2)(d), and that the Secretary of State's certification of the measure is therefore unlawful. They seek injunctive and other relief designed to keep Ballot Measure 11 off the ballot. The trial court found that these plaintiffs are barred by laches. It dismissed the case. The case comes here on certification from the Court of Appeals. ORS 19.210. We affirm the judgment of the trial court, but on a different ground.

### JURISDICTION OF THIS COURT

This case has been delayed by certain procedural and jurisdictional difficulties. The trial court's judgment dismissing plaintiff's case was signed on August 25, 1986. As it happened, however, the judgment was not entered in the trial court register[2] until August 28, 1986. In the meantime, plain-

---

[1] ORS 246.910(1) provides:

"A person adversely affected by any act or failure to act by the Secretary of State or a county clerk under any election law, or by any order, rule, directive or instruction made by the Secretary of State or a county clerk under any election law, may appeal therefrom to the circuit court for the county in which the act or failure to act occurred or in which the order, rule, directive or instruction was made."

[2] ORS 19.026 requires that "notice of appeal shall be served and filed within 30 days after entry of the judgment appealed from." In *Blackledge v. Harrington,* 289 Or 139, 611 P2d 292 (1980), we interpreted "entry" in ORS 19.026 to refer to entry in the journal. The journal was a record trial court clerks were required to keep by ORS 7.010 prior to its amendment in 1985. The journal was abolished as a record trial court clerks were required to maintain by Oregon Laws 1985, chapter 540, section 1, in favor of the register. *See* present ORS 7.010 and 7.020. We now interpret ORS 19.026 to refer to entry of a judgment in the trial court register as the event that triggers the running of the 30-day appeal period.

tiffs filed a notice of appeal on August 26. Attached to it was a copy of the signed (but not yet registered) August 25 judgment. That notice of appeal was premature; there was not yet a judgment from which an appeal could be taken.

Plaintiffs, realizing that their first notice of appeal was premature, filed an amended notice of appeal on September 5, 1986. This notice was correct as to form and was timely. However, another problem existed. ORS 19.033(1) provides:

> "When the notice of appeal has been served and filed as provided in ORS 19.023, 19.026 and 19.029, the Supreme Court or the Court of Appeals shall have jurisdiction of the cause, pursuant to rules of the court, but the trial court shall have such powers in connection with the appeal as are conferred upon it by law and shall retain jurisdiction for the purpose of allowance and taxation of attorney fees, costs and disbursements or expenses pursuant to rule or statute. * * *"

This court has recognized that the pendency of an appeal deprives a trial court of authority to make substantive rulings, *Nickerson and Nickerson,* 296 Or 516, 522-23, 678 P2d 730 (1984), and the Court of Appeals has long held that, in cases like the present one, filing a notice of appeal divests a trial court of jurisdiction subsequently to enter a judgment — *see, e.g., Murray Well-Drilling v. Deisch,* 75 Or App 1, 704 P2d 1159 (1985). It follows that plaintiffs' appeal of August 25 was not taken from a judgment or other final order, ORS 19.010, but did serve to oust the trial court of jurisdiction so that the actual entering of the judgment on August 28 was ineffectual and the subsequent, September 5, appeal was also premature. There was, as yet, no final, appealable judgment in this case.

The foregoing problem was pointed out to counsel at oral argument. Supplemental memoranda were requested and received from the parties. Both parties asked that, rather than dismiss the appeal, this court follow the procedure set out in ORS 19.033(4). That statutory subsection, enacted in 1985 (Oregon Laws 1985, chapter 734, section 5), provides:

> "* * * * *

> "(4) Notwithstanding the filing of a notice of appeal, the trial court shall have jurisdiction, with leave of the appellate court, to enter an appealable judgment if the appellate court determines that:

"(a) At the time of the filing of the notice of appeal the trial court intended to enter an appealable judgment; and

"(b) The judgment from which the appeal is taken is defective in form or was entered at a time when the trial court did not have jurisdiction of the cause under subsection (1) of this section, or the trial court had not yet entered an appealable judgment."

Having determined that the criteria of ORS 19.033(4)(a) and (b) had been met, this court accepted the parties' recommendations and entered an order on September 11, 1986, that gave the trial court leave to enter an appealable judgment. The trial court entered such a judgment on September 19, 1986, and the plaintiffs filed a proper notice of appeal on September 23, 1986. The case is now properly before us.[3]

## LACHES

Plaintiff Ellis is the president and plaintiff Crumpton is the executive secretary of the Oregon Education Association (OEA). Ballot Measure 11, which creates a homestead exemption from property taxes and also prohibits the legislature from enacting or referring to the people a general sales tax, is opposed by OEA. OEA supports a competing measure, Ballot Measure 7, which would enact a sales tax.

■ ■ The elements of laches are delay by a party, with knowledge of relevant facts under which it could have acted earlier, to the substantial prejudice of an opposing party. *See Stephan v. Equitable S & L Assn.,* 268 Or 544, 569, 522 P2d 478 (1974). Plaintiffs and OEA have been aware, at least in general terms, of the existence of Ballot Measure 11 since the prospective petition was filed with the Secretary of State on April 30, 1985, and approved for circulation by her on August 16, 1985. All of the defendants, in their answers to plaintiffs' complaint, alleged as an affirmative defense that plaintiffs were therefore guilty of laches.

In the trial court, both sides moved for summary judgment on the laches issue. Affidavits were filed by both

---

[3] The procedure was a little more complicated than even this suggests. The original (August 25) appeal went to the Court of Appeals. ORS 2.516. That court, however, certified the appeal to this court and we accepted jurisdiction. ORS 19.210. The present (September 23) appeal also went to the Court of Appeals, which again certified the cause to this court. We accept the certification. ORS 19.210(2).

sides. On August 22, 1986, the trial court held an extensive hearing that included taking testimony from four witnesses. The matter was taken under advisement and, on August 25, the court announced its judgment, holding that these two plaintiffs were barred by laches. The judge explained,

"Now, in this case we are not dealing with some green-pea people involved in the process. We are dealing with the most sophisticated, articulate and knowledgeable people in the election process in the State of Oregon."

In this court, plaintiffs argue that laches should not have been applied against them because (1) all of the evidence establishes as a matter of law that they were not aware of the defect they allege is found in Ballot Measure 11 until just before they commenced this action or, (2) at the least, there is a material issue of fact as to whether they were aware, so that summary judgment was inappropriate.

The parties style the trial court's decision as "summary judgment," although the court took live testimony from both sides and there is no document granting "summary" judgment in the file. The judgment entered purports to be a "judgment" — nothing more. We think it more accurate to say that trial was held on a segregated issue, but the labels do not matter in this case. The issue is the propriety of applying laches to these plaintiffs. We hold that it was inappropriate.

ORS 246.910(1) requires only that a person be "adversely affected" before he can bring an action challenging an election ruling of the Secretary of State. In effect, this means that any registered voter — and probably others, as well — can file an action. *See Columbia River Salmon & Tuna Packers v. Appling*, 232 Or 230, 234-35, 375 P2d 71 (1962). The potential plaintiff "pool" in these cases is over one million. To require in a particular case that a trial judge take evidence and decide whether there are a few people who may not bring such an action, when a million could, is a waste of time. We hold that laches should not be utilized in this way in actions under ORS 246.910(1) or under a parallel theory advanced under the declaratory judgments act.

Defendants rely on *State ex rel Fidanque v. Paulus*, 297 Or 711, 688 P2d 1303 (1984), where this court did forestall a "one subject only" attack on a ballot measure by applying

the doctrine of laches. *Fidanque,* however, was a case involving this court's original mandamus jurisdiction. Mandamus in this court is an extraordinary remedy, available only as a matter of discretion, administered on equitable principles and subject to equitable defenses. *See, e.g., Buell v. Jefferson County Court,* 175 Or 402, 152 P2d 578, *reh den* 154 P2d 188 (1944). The party must show affirmatively that he has no plain, speedy and adequate remedy in the normal course of the law. ORS 34.110; *State ex rel Sajo v. Paulus,* 297 Or 646, 688 P2d 367 (1984). We called upon all the aforementioned considerations when we ruled, in *Fidanque:*

> "In view of the presumption favoring the exercise of the initiative power, the lack of any adequate reason given by the Plaintiff-Relators for their delay in making this challenge until the eleventh hour and the potential availability of post-election challenge under [Oregon Constitution] Article IV, section 20, should Ballot Measure 8 ultimately be approved, it is not unreasonable to hold that Plaintiff-Relators' challenge was not timely." 297 Or at 719.

Our application of laches in *Fidanque* was a vindication of established principles relating to our exercise of an original jurisdiction that we attempt to confine to the most needful cases.[4]

By contrast, the present case is one in which plaintiffs seek through the ordinary course of the law to challenge certain election law actions of the Secretary of State. Such challenges are specifically authorized by law and any "adversely affected" person can bring one. ORS 249.910(1). The trial court is better situated than are we to resolve competing factual contentions, but that resolution takes time and does not eliminate the eligibility of other potential plaintiffs. The trial court has no discretion to refuse to entertain such actions at all, while this court has such authority. We adhere to *Fidanque,* but we hold that the considerations that justified our application of laches there have no application to non-discretionary consideration of these cases by the trial courts.

---

[4] Even in *Fidanque,* however, utilization of laches was possible only because we felt we could determine, from the face of the petition, that the plaintiff-relators' reasons for delay in bringing their challenge were legally inadequate. The difficulties that would have faced this court had the plaintiff-relators' alleged reasons been the subject of factual contention between the parties are obvious.

## REASONABLE TIME

Defendants argue that, even if the application of the doctrine of laches is inappropriate, these plaintiffs should still be barred because their action was not commenced within a "reasonable time." This argument presents three issues: (1) Should actions like the present one be subject to some kind of "reasonable time" limitation on filing, in the absence of statutes imposing such restraints? (2) If some reasonable time period should be imposed, when does it begin to run? (3) How long is a reasonable time, in cases of this kind? We address each question in turn.

*1. Must actions be filed in a "reasonable time"?*

While we answer this question in the affirmative, we wish to note at the outset that, with respect to this question and the two which follow, we are providing our answers in a legislative vacuum. The legislature is at liberty to answer all three questions in other ways, if it finds it appropriate to do so. In the absence of legislation, however, we are required to provide some judicial framework until the legislature provides a statutory one.

In *OEA v. Roberts,* 301 Or 228, 235, 721 P2d 833 (1986), this court ruled that the Secretary of State has a duty, under Oregon Constitution, Article IV, section 1(2)(d), to examine proposed ballot measures for compliance with the "one subject only" rule and to refuse to accept or approve those that violate the rule. The duties of the Secretary of State with respect to ballot measures involve "a series of decisions." *State ex rel Fidanque v. Paulus, supra,* 297 Or at 716 n 5; *see also OEA v. Roberts, supra,* 301 Or at 232-35. Although, as noted, it was a mandamus action, we find the *Fidanque* analysis of this problem helpful. We therefore deal with that case at some length.

We described the procedural history of the ballot measure in *Fidanque* this way:

"On September 28, 1983, a prospective petition that eventually became Ballot Measure Number 8 was filed with the Secretary of State's office. That office sent copies of the signature pages to Multnomah, Clackamas and Washington Counties for verification. [ORS 250.045(1).] The counties verified the signatures and returned them to the Secretary of

State and on October 6, 1983, she sent two copies of the prospective petition to the Attorney General's office for preparation of a ballot title. On October 20, 1983, the Attorney General certified and returned to the Secretary of State a ballot title. ORS 250.065(3).

"On October 21, 1983, the Secretary of State issued a press release describing the proposed initiative. The ballot title was appealed to this court on November 9, 1983, and on January 24, 1984, this court certified a modified ballot title. *Wells v. Paulus,* 296 Or 338, 675 P2d 482 (1984). On July 20, 1984, the Secretary of State, after verifying that sufficient signatures had been collected, assigned Ballot Measure Number 8 to the initiative petition. On August 8, 1984, plaintiff-relators filed an application and petition for writ of mandamus in this court." 297 Or at 713 (footnote omitted).

The first issue this court faced in *Fidanque* was: Assuming that the Secretary of State has a duty to consider whether a proposed initiative violates the "one subject only" rule of Oregon Constitution, Article IV, section 1(2)(d) — an issue we would not answer affirmatively until the later case of *OEA v. Roberts, supra* — when does that duty commence? Again, we quote from our opinion in *Fidanque* at length:

"Plaintiff-Relators argue that the Secretary of State breached her duty on July 20, 1984[,] when she certified the petition and assigned to it a ballot measure number. However, in light of the statutes and existing caselaw, we hold that *if* the Plaintiff-Relators' allegation that a duty was created is correct, that duty would have been breached when the prospective petition was *approved* under ORS 250.065(2) and was sent to the Attorney General for a ballot title.[4] It is this determination that provides the first opportunity for the Secretary of State to exercise her official power with respect to the prospective petition. 'If * * * there is a constitutional duty to act, it would arise at this time. It is in approving a prospective petition which did not comply with the * * * requirements of Article IV, section 1, that the Secretary of State's authority under the constitution and statutes first would be exceeded and her duty breached. [Footnote omitted.]

---

4

"The Secretary of State may refer questions to the Attorney General under ORS 180.060(2) upon any question of law upon which the State of Oregon may have an interest, or subsection (5) of ORS 180.060 wherein 'the Attorney General shall, when requested, perform all legal services for the State or any department or officer of the State.' Thus, the Secretary of State

could refer the question whether a proposed law 'embraced one subject only and matters properly connected therewith' to the Attorney General at the time that the prospective petition was filed with the Secretary of State's office and forwarded to the Attorney General for preparation of a ballot title pursuant to ORS 250.065.

"In *Holmes v. Appling,* 237 Or 546, 554-55, 392 P2d 636 (1964), this court addressed the issue of when the duty of the Secretary of State to determine his constitutional authority arose. In *Appling,* Plaintiff-Relators were attempting to force the Secretary of State to furnish a ballot title for a proposed law. The Secretary of State refused to furnish the ballot title 'because he had been advised by the Attorney General that the petition proposed a new constitution or a revised constitution and that the initiative power reserved to the people to amend the constitution does not permit the submission to the people of a revised or new constitution and that he was acting upon such advice.' *Id.* at 548.

"In essence, the *Appling* court said that the Secretary of State had the initial duty to determine if the constitution allowed the action being taken by the Plaintiff-Relators[,] stating: '[T]he defendant [Secretary of State] necessarily was required to determine whether our laws granted him authority to pursue the course which the plaintiffs requested.' *Id.* at 554. Thus, it would be at the approval stage of the prospective petition that the Secretary of State has the duty to determine if the requested action was constitutional." 297 Or at 715-16 (Emphasis in original).

This court also stated:

"One can visualize a time line in the submission procedure involved in the initiative process. No initiative petition may be circulated without the approval of the Secretary of State and the issuance of a ballot title. ORS 250.045(1), ORS 250.065(2), (3) and (4). Approval by the Secretary of State is conditioned not only upon verification of the required number of sponsor signatures, but also upon determination that the use of the initiative power in each case is authorized by the Constitution. *Holmes v. Appling, supra.* Once this initial determination is made, that decision is then reviewable by the courts. It is at this point that the process of submitting initiated measures to the people begins. If the Secretary of State has made an error in determining the extent of her constitutional authority, the clock for timeliness of review begins ticking at this initial step.

"The next step is issuance of the ballot title. This is the second discrete step in the submission process. That decision

is also reviewable by the court and any challenge must be made within 20 days or the right to challenge is lost. * * *

"The third discrete step in the submission process is the verification of signatures and certification of the measure for ballot. Again, but not until the action is taken by the Secretary of State, the process is open for court review of the action taken. *State ex rel Sajo v. Paulus,* 297 Or 646, 688 P2d 367 (1984).

"Therefore, in the submission process, a series of decisions must be made. As each decision is made, it becomes susceptible to challenge." 297 Or at 715-16 n 5.

After the foregoing discussion in *Fidanque,* this court turned to a consideration of the effect a late challenge to a ballot measure would have on the initiative process. We first noted that, if eleventh-hour challenges were entertained,

"* * * the organizers and proponents of * * * [a] measure * * * [will have] in essence wasted their time, energy and money to obtain sufficient signatures to be certified for placement on the ballot." 297 Or at 718 n 6.

We further said,

"Besides being prejudicial to * * * the petition circulators, * * * delay puts an unreasonable burden on the court. The matter could have been litigated in the circuit court with ample time for the narrowing and clarification of issues through the normal judicial process. * * * To wait until the last moment places the court in a position of having to steamroll through the delicate legal issues in order to meet the deadline for measures to be placed on the ballot. In light of the great value ascribed to the exercise of the initiative power by the people, by the Oregon Constitution, and the courts and the substantially negative impact that rushed, last minute reviews would have on the exercise of the initiative power, this court has been and should be very wary of last minute challenges." 297 Or at 718.

Our remarks were made in the context of a mandamus proceeding in *Fidanque,* but they have an equal place here. The present measure was first filed with the Secretary of State on April 30, 1985. Petitions were approved for circulation on August 16, 1985 — over 13 months ago. On July 16 of this year — 11 months after circulation of petitions began — the Secretary of State certified Ballot Measure 11 for the November ballot. On July 24, these plaintiffs made written

demand on the Secretary of State that she remove Ballot Measure 11. The present action was commenced on July 31, 1986. The trial court hearing that led to the judgment under consideration here occurred 22 days later. The rest of the hurried history of this case has already been chronicled. One thing is clear: An eleventh-hour action in the trial court leaves no more time for "the narrowing and clarification of issues through the normal judicial process" than did the eleventh-hour petition for writ of mandamus in *Fidanque.* If these actions are not brought within a reasonable time after they first could have been brought, meaningful judicial review will be difficult, if not impossible. We hold that actions like the present one must be brought within a reasonable time. We adopt this statement from *Fidanque:*

> "* * * [R]eview under the 'single subject only' language of Article IV, section 1(2)(d) * * * must be commenced within a reasonable time after approval by the Secretary of State and the submission to the Attorney General for a ballot title. This will allow participants in the initiative process to rely on the finality of such determinations so far as the attempts to collect signatures are concerned and at the same time provide potential challengers of the proposed measure adequate time to bring suit." 297 Or at 718.

*2. When does the reasonable time period begin to run?*

■ Again, we adhere to the answer we stated in *Fidanque:* such actions must be brought within a reasonable time after preliminary petitions for a ballot measure have first been approved by the Secretary of State and submitted to the Attorney General for a ballot title. There is a season for each kind of challenge to the Secretary of State's administration of the election laws, whether as to the ballot title, the signature gathering process or constitutional evaluation. ORS 250.045(1); 250.065(2), (3) and (4). The Secretary of State makes — or fails to make — the constitutional decision at the outset. *OEA v. Roberts, supra; State ex rel Fidanque v. Paulus, supra; Holmes v. Appling, supra.* Later actions, such as acceptance of a ballot title from the Attorney General, verification of signatures and certification, do not call for her to reassess the original constitutional evaluation that is supposed to be the predicate for placing the entire initiative machinery in operation. It is either done or not at this initial stage. The period of reasonable time commences then.

### 3. *How long does the period of reasonable time extend?*

We think the answer to this question necessarily must take into consideration the ballot title preparation process. It is only after the Attorney General has prepared a title and certified it to the Secretary of State and the title either has been legally challenged or the time for such a challenge has passed that petitions are actually circulated to the voters at large. Requiring a challenge to the constitutional determination of the Secretary of State prior to the petitions being circulated tends to limit challenges to the *cognoscenti;* if that were the rule, we might as well reimport laches into the process. We note also that the duty of the Secretary of State to review for compliance with the "one subject only" rule is not necessarily a brief, self-executing process. She often may need the period of time from initial filing to ballot title certification to determine the acceptability of the measure.

The question boils down to this: How long after the ballot title finally is approved and the public at large presumably becomes conversant with the proposed measure is it reasonable to say that actions like the present one reasonably may yet be brought? While many answers can be given — and, again, we note that the legislature is free to do as it wishes — we think the answer is 60 days.

We identify 60 days by looking to other expressions of legislative policy on questions like this. The Secretary's decision that the proposed measure does not violate the "one-subject only" rule is, in Administrative Procedures Act terms, an "order in other than a contested case." ORS 183.310(5)(a), 183.484. A challenge to an order in other than a contested case — like appeals of all the Secretary of State's actions or failure to act with respect to the election laws, ORS 246.910(1) — is taken to the circuit court. ORS 183.484. Such challenges must be brought within 60 days. ORS 183.484(2). This court has, in the mandamus context, similarly used a statute analogous to the case on review to limit the time in which a challenge to a trial court's rulings could be brought. *State ex rel Redden v. Van Hoomissen,* 281 Or 647, 576 P2d 355, *reh den* 282 Or 415, 579 P2d 222 (1978) (time in which state may seek mandamus challenging trial judge's order granting a new trial in a criminal case limited to 30 days, the same length of time in which a criminal appeal could be taken). We find a similar methodology appropriate here.

 We hold that the reasonable time for challenging the decision of the Secretary of State — including her failure to decide — whether a proposed initiative violates the "one subject only" rule of Oregon Constitution, Article IV, section 1(2)(d), expires on the 60th day following final approval of the ballot title. As previously recited, the challenge in this case was not filed until 11 months after the ballot title was established. It was not timely. The trial court's order dismissing plaintiff's complaint was therefore correct. It is affirmed.[5]

Judgment of the trial court affirmed.

---

[5] Because of the disposition we make of this case, we do not reach the issue whether Ballot Measure 11 violates the "one subject only" rule of Oregon Constitution Article IV, section 1(2)(d). We also do not address the question whether, in light of the timeliness requirement we place on pre-election challenges of this kind, a post election challenge of the kind that occurred in *Anthony v. Veatch,* 189 Or 462, 220 P2d 493, *reh den* 221 P2d 575 (1950), still would be possible. *But see State ex rel Fidanque v. Paulus, supra,* 297 Or at 719.