Argued and submitted January 8, affirmed August 25, appellant's petition for reconsideration filed September 29, 1993 allowed by opinion January 26, 1994
See 126 Or App 113 (1994)

CHEVRON PIPE LINE CO.,
a Delaware corporation,
*Appellant,*

*v.*

Donald DE ROEST,
*Respondent,*

JOHN DOES 1 THROUGH 10
and Corporations A Through Z,
*Defendants.*

(900561; CA A72903)

858 P2d 164

Stephen R. Thomas, Boise, Idaho, and John H. Kottkamp, Pendleton, argued the cause for appellant. With them on the briefs were Moffatt, Thomas, Barrett, Rock & Fields, Chartered, Boise, Idaho, and Kottkamp & O'Rourke, Pendleton.

George W. Kelly, Eugene, argued the cause for respondent. With him on the brief was Silven, Schmeits & Vaughan, Baker.

Before Rossman, Presiding Judge, and De Muniz and Leeson, Judges.

ROSSMAN, P. J.

De Muniz, J., dissenting.

## ROSSMAN, P. J.

In this action for a permanent injunction, plaintiff, the owner and operator of an interstate petroleum products pipe line that crosses defendant's property in Baker City, seeks an order enjoining defendant from placing further fill material over the pipe line and requiring defendant to remove fill material and heavy equipment that he has placed there, allegedly in violation of plaintiff's easement. The trial court denied plaintiff's request for an injunction and entered judgment for defendant. Plaintiff appeals. We review *de novo*, ORS 19.125(3), and affirm.

In 1950, defendant's three predecessors conveyed a 16.5-foot easement across their land to plaintiff's predecessor, the Salt Lake Pipe Line Company, for the purpose of transporting various liquid petroleum products from a refinery in Salt Lake City, Utah, to Spokane, Washington, and intermediate points. The instruments conveying the easements are substantially identical. They grant to plaintiff

"the right of way from time to time to lay, construct, reconstruct, replace, renew, repair, maintain, operate, change the size of, increase the number of, and remove pipe lines and appurtenances thereof, for the transportation of oil, petroleum, gas, gasoline, water or other substances, or any thereof, and to erect, install, maintain, operate, repair, renew, power lines and appurtenances thereof on a single line of poles or underground, as Grantee from time to time and place to place may elect, with the right of ingress and egress to and from the same, over and through, under and along that certain parcel of land situated in Baker County, State of Oregon * * *."

The conveyances reserve to defendant's predecessor

"the right to use and enjoy said premises, provided that Grantor shall not construct or maintain the whole or any part of any structure on said strip of land or in any manner impair or interfere with the present or prospective exercise of any of the rights therein granted."

Plaintiff, a wholly owned subsidiary of Chevron USA, succeeded to the easement rights of Salt Lake Pipe Line Company. Plaintiff is a common carrier and subject to the federal Department of Transportation tariffs and regulations promulgated by the Secretary of Transportation pursuant to

the Hazardous Liquid Pipeline Safety Act of 1979. Plaintiff must also comply with the federal Environmental Protection Act and the Occupational Safety and Health Act.

Defendant acquired the property in two parcels, in 1976 and 1978, for the purpose of parking equipment on it. At the time, the property sloped downhill toward the east, from Highway 7 to the Powder River. The Powder River is a navigable waterway subject to the jurisdiction of the Coast Guard. Defendant testified that the slope of the land made it less than desirable for his intended purpose, and from the beginning of his ownership he has received fill material of various kinds, consisting largely of dirt, concrete and asphalt. Over the years, he has filled the upper portion of his property so that it is approximately level with Highway 7. He has created two terraces that intersect the slope at right angles. At the edge of the higher terrace, plaintiff's pipe line is covered to a depth of approximately 22.5 feet. At the edge of the lower terrace, the depth is approximately 10.5 feet. Before defendant began to fill his property, the average depth of the pipe line was 1.5 to 3.5 feet below the surface. Defendant has never sought plaintiff's permission to fill the property and did not believe that he was required to do so.

The portion of the pipe line that crosses defendant's property pursuant to the easement enters the property at the high point and travels 250 feet down the slope, leaving the property as it passes under the Powder River. The pipe is eight inches in diameter and made of one-quarter-inch-thick steel with asphaltic wrapping. Products transported through the line include diesel fuel, refined gases, stove oil and aviation fuel. Centrifugal pumps drive the products through the pipe line under a pressure of 950 pounds per square inch and at a rate of about 58,800 gallons per hour. Plaintiff can automatically shut down the pipe line pumps in about 15 minutes. Product then remaining in the pipe line on defendant's property continues to produce about 300 pounds per square inch of pressure. In the event of a leak, the pressure would force product out of the pipe until the leak is stopped or the 58,800 gallons of product remaining in the pipe line is emptied.

Plaintiff's agents inspect the length of the pipe line on foot, by motor vehicle and by airplane. One agent, Martoccia, testified that, between 1977 and 1986, plaintiff patrolled

the pipe line by airplane twice each month. Since 1986, there has also been a surface patrol. In April, 1977, plaintiff's "Individual Pipe Line Patrol Flight Log" contains a reference to activity near the pipe line in the vicinity of defendant's property. Plaintiff's "Aerial Patrol Report" for April 7 and 8, 1980, reports "equipment working leveling what looks like a spot for a building." Plaintiff's "Bi-Weekly Line Rider Report" for August 4, 1987, refers to fill being placed over the pipe line on defendant's property to a depth of ten feet. Similar reports of activity are contained in reports made in 1987, 1988 and 1989. Definitely by 1987, plaintiff was aware that defendant had parked large equipment on the easement and had placed fill on it, including chunks of asphalt and concrete. In April, 1988, Watts, plaintiff's inspector, spoke to a man in defendant's shop building and cautioned him about activity on the easement.

George Adams, an independent right-of-way specialist working exclusively for plaintiff since February, 1988, testified that he visited defendant in September, 1990, to express plaintiff's concern about defendant's equipment and fill on the easement. He testified that he and defendant discussed the terms of the easement.

On October 12, 1990, plaintiff's attorney wrote to defendant demanding that defendant remove fill material, so that the pipe line is not deeper than 10 feet below the surface, and that defendant stop adding fill material and parking equipment on the easement. Defendant has said that he will not add more fill, but has not agreed to remove equipment or existing fill. He testified that to remove fill would leave a trench through his property that would permit erosion over time due to melting snow.

Plaintiff contends that the presence of the fill and equipment "impairs" plaintiff's access to the pipe line and therefore violates the easement's restriction on defendant's use of the property. Plaintiff now asks that defendant be required to stop parking equipment on the easement and to remove the fill to a depth of not more than five feet above the pipe line. Department of Transportation regulations do not prescribe a maximum cover.

■ ■ The trial court denied plaintiff's request for an injunction:

> "IT IS HEREBY ORDERED the Plaintiff is denied any and all relief as prayed for in Plaintiff's Complaint for Injunctive Relief and Plaintiff shall take nothing thereby excepting only that Defendant is permanently enjoined from interfering with any excavation Plaintiff may hereafter undertake on that portion of Plaintiff's easement which crosses Defendant's property upon which Defendant has deposited fill material to the extent that Plaintiff is required to place excavated material on Defendant's property as necessary to comply with applicable laws, rules, and regulations concerning trenching requirements."

In plaintiff's view, and the dissent's, the placement of fill on the pipe line is, *per se*, an interference with plaintiff's right to install, replace and repair the pipe and, accordingly, a violation of the easement. Both pay lip service to, but side step, the rule that the rights of the dominant and servient tenants are relative to each other, not absolute. In *Minto v. Salem Water Etc. Co.*, 120 Or 202, 212, 250 P 722 (1926), the court said:

> "The right of the easement owner, and the right of the land owner, are not absolute, irrelative, and uncontrolled, but are so limited, each by the other, that there may be a due and reasonable enjoyment of both."

As the trial court said, to interpret the easement as creating a literal injunction of *any* impairment of plaintiff's access to the pipe line

> "would require a pristine path 16 1/2 feet wide stretching from Salt Lake City to Spokane. It would mark or prevent corn fields, airports, driveways, woodlots, cities, towns, any proposed use of servient land predated by the easement which would create some impairment to Plaintiff's use of the easement. If Plaintiff's argument is correct, and its right to free exercise of the easement cannot be impaired, it could not be required to thrash through seven foot tall corn stalks to work within the easement."

We conclude that the trial court correctly rejected an absolute restriction on the servient tenant's right to use the property and instead considered whether, in view of all the circumstances, the use to which the servient tenement proposes to subject the easement is a reasonable one and will not deprive the easement owner of the degree of use to which it is entitled.

*Marsh v. Pullen*, 50 Or App 405, 408, 623 P2d 1078, *rev den* 290 Or 853 (1981).

■■ As plaintiff has noted, the reasonableness of a given use is controlled principally by the language of the instrument conveying the easement, for it is that language that defines the extent of the rights granted and reserved and determines what use each party may make of the property. *Fendall v. Miller*, 99 Or 610, 615, 196 P 381 (1921). Under the terms of the easement, plaintiff has the right to install equipment above and below the ground and to maintain it as necessary for the transportation of petroleum products. Defendant has the right to use and enjoy his property to the extent that he does not impair or interfere with plaintiff's use of the easement.

■ Significantly, the original parties to the easement appear to have contemplated a use of the property that is even more intensive than that to which defendant has put it. A rider to the easement provides:

> "Grantee [plaintiff's predecessor] assumes absolute liability for * * * any loss or damage by fire caused as the result of the ignition from any cause whatsoever of any of said materials carried in or seeping from said pipeline. In connection therewith *it is understood and contemplated by the parties that the lands covered hereby are used as part of a sawmill operation in connection with which substantial quantities of lumber and other inflammatory products accumulate and may be piled in close proximity to said pipeline.*" (Emphasis supplied.)

Contrary to the dissent's view, the fact that the parties recognized such a use as permissible is a strong indication as to what type of access they contemplated would be reasonable under the terms of the easement. We have no way to know, on this record, whether defendant's use of the property is a greater interference with plaintiff's access than the piling of "substantial quantities of lumber and other inflammatory products * * * in close proximity" to the pipe line. It is plaintiff's burden to make that showing, and it has not been made.

There is evidence, and we find, that, in the event of a leak in the pipe, the placement of fill has increased plaintiff's costs, access time, safety risks and liability exposure over

what they were before the fill was added.[1] The record shows further, however, that, barring some disaster such as an earthquake or nuclear explosion, the chance of a leak occurring on defendant's property is remote to nonexistent, and that the placement of fill on the property protects the pipe from damage by third parties and has actually reduced the likelihood of a leak. Further, contrary to the dissent's suggestions, the presence of the fill does not impair plaintiff's ability to detect a leak, which it does by measuring pressure in the pipe and product volume. On the other hand, the removal of the fill with large equipment could damage the pipe line. Additionally, plaintiff's own conduct demonstrates that it did not consider the presence of the fill to be dangerous or a significant impairment of the easement. Although plaintiff was probably aware of defendant's use of the property as early as 1980, it chose to ignore defendant's activity until the terracing was almost complete, and did not even suggest that the fill be removed until 1990.

In view of all these circumstances and considerations, we find, on *de novo* review, that defendant's use of his property does not interfere with plaintiff's use of the easement in a manner that was not contemplated by the parties at the time the easement was granted. Given our disposition of this first assignment of error, we need not address the second through fifth assignments, which relate to the trial court's allowance of defendant's defenses of laches, waiver and equitable estoppel.

■ In its sixth and seventh assignments of error, plaintiff contends that the court erred in admitting evidence

---

[1] The dissent seems driven by a sense of fear over the hypothetical consequences of a leak in the pipe. Although we do not doubt the sincerity of the dissent's concern, here the facts simply do not justify it. As the trial court found:

"Defendant has enhanced the utility of his property in a way that does not pose an acute threat to Plaintiff's operation. Of the various hazards which Plaintiff risks in its operation (third party damage, corrosion and natural disaster), corrosion of the pipe line is the most likely [of the three] to occur on Defendant's property. The pipe line was installed nearly 40 years ago and there is no indication of corrosion in the area which Defendant has overfilled. Third party damage is less likely than before. Natural disaster is at best a crap shoot."

The risk of a leak due to overfill is apparently so slight that plaintiff's employees chose not to mention it to defendant, and, in their reports to plaintiff, consistently, and for a period of years after they had become aware of the fill, reported "no hazards."

regarding other easements through which plaintiff's pipe line passes. We agree with plaintiff that the evidence was irrelevant to the question of whether defendant's use of the property was in violation of this easement. On our *de novo* review, we have disregarded it.

Affirmed.

**De MUNIZ, J.,** dissenting.

The majority correctly recognizes that the rights of an easement holder and the owner of the servient tenement are relative and are circumscribed by the unambiguous language of the express grant. The majority also makes proper factual findings:

"[I]n the event of a leak in the pipe, the placement of fill has increased plaintiff's costs, access time, safety risks and liability exposure over what they were before the fill was added." 122 Or App at 446-47.

Unfortunately, the majority misapplies those facts to the express terms of the grant and perpetuates the error that the trial court committed. Accordingly, I dissent.

The instruments that created the easement conveyed to plaintiff's predecessor a right of way

"to lay, construct, reconstruct, replace, renew, repair, maintain, operate, change the size of, increase the number of, and remove pipe lines and appurtenances thereof, for the transportation of oil, petroleum, gas, gasoline * * *."

Obviously, the parties to the original grants contemplated that the easement holder required periodic access to the pipe lines to repair or replace them. The rider shows that the parties considered the dangerous nature of the substances that pass through the pipes, and the grantee assumed responsibility for damage that might result from the pipes' failure.

The original conveyances show that the parties recognized that the grantee required the pipes to be readily accessible. The owner of the servient tenement could not "in any manner impair or interfere with the present or prospective exercise of [the easement holder's rights]." Plaintiff has the right to install, replace and repair readily accessible pipes for the purpose of transporting volatile and toxic substances. It is beyond peradventure that those rights were impaired

when defendant began piling dirt, concrete and asphalt on top of the pipes.

The depth of the pipes is now three to seven times as great as it was when defendant began piling rubble above them. Plaintiff responsibly conducts frequent surveillance to detect seepage from the pipes. However, unlike the majority, I am not convinced that

"the presence of the fill does not impair plaintiff's ability to detect a leak, which it does by measuring pressure in the pipe and product volume." 122 Or App at 447.

Plaintiff's area supervisor, Martoccia, testified that the equipment for detecting a decrease in pressure was "accurate," but he did not quantify that term. Moreover, he testified that the pressure monitoring equipment would not detect a "weeping leak," which is smaller than a pin hole. When asked if a weeping leak would create a hazard, Martoccia answered:

"Yes sir, it would. It would create a pollution to the environment, and depending upon the product that's in it could cause a problem to personnel that were around [the] area where the product is leaking."

He explained that a weeping leak could be detected by comparing the volume of product that goes into the line to the volume of product that emerges.

Although the volumetric assessments are "accurate," no measuring system is perfect, and I am convinced that very slow leaks will go undetected. Ultimately, a small undetectable leak may release a substantial amount of product before it is discovered by visual inspection. Increasing the depth of the pipe by covering it with fill material creates a risk of greatly increasing the amount of product that could be released before it is detected. That risk is unreasonable.

The majority improperly relies on the rider, which allows the owner of the servient tenement to continue operating a sawmill on "the lands covered hereby."[1] Recognition of that pre-existing use does not indicate that the grantors had the right to pile debris above the pipes and increase the depth

---

[1] The conveyances do not indicate whether the sawmill was located directly above, adjacent to or near the strip of land subject to the easement.

of them several fold. That is contrary to the express language of the conveyances. The rider does allow the piling of debris, but only "in close proximity to said pipeline." Close proximity does not mean directly above. It means nearby.

The original parties to this conveyance conscientiously established terms that enable the easement holder to install and maintain pipe lines in an environmentally responsible and efficient manner. Defendant's conduct violates the terms of his easement, because it profoundly impairs plaintiff's ability to do that.

Defendant contends that, even if he has violated the terms of his easement, plaintiff's claim is barred by laches.[2] Defendant had the burden of proving the affirmative defense of laches. *Albino v. Albino*, 279 Or 537, 552, 568 P2d 1344 (1977); *Warren and Joeckel*, 61 Or App 34, 38, 656 P2d 329 (1982). Defendant was required to show

> "[1] delay by [plaintiff], [2] with knowledge of relevant facts under which it could have acted earlier, [3] to the substantial prejudice [to defendant]." *Ellis v. Roberts*, 302 Or 6, 10, 725 P2d 886 (1986).

Defendant did not satisfy that burden.

There is evidence that defendant began depositing fill material on or around the easement in the late 1970s, but the record indicates that plaintiff did not become aware that defendant was violating the terms of the easement until much later. Plaintiff observed "activity near the pipe line" in 1977. At that point, plaintiff did not have "full knowledge of all of the facts." *Stephan v. Equitable S & L Assn.*, 268 Or 544, 569, 522 P2d 478 (1974). At most, plaintiff had information that merely suggested defendant might exceed his permissible use of the easement. It was not until August, 1987, that plaintiff knew about "fill being placed over the pipe line * * * to a depth of ten feet."

Plaintiff began to complain about the fill material as early as April, 1988. Nonetheless, defendant continued to place additional fill material over the pipe line. Plaintiff hired a right-of-way specialist named Adams. On September 6,

---

[2] The trial court apparently considered, but did not decide, this issue.

1989, Adams told defendant not to place any more fill material on the easement area. Defendant apparently ignored that request and continued dumping fill material at the site.

The evidence shows that no more than a few months elapsed between the time that plaintiff had "full knowledge of all of the facts" and the moment when he insisted that defendant stop depositing fill material. The real prejudice to defendant was caused by his own refusal to stop depositing fill material after plaintiff insisted that he do so. This suit is not barred by laches. The trial court erred by denying plaintiff's request for injunctive relief, and so does the majority.

I dissent.