Argued and submitted January 27, second order vacated; first order affirmed in part and reversed in part; remanded to trial court May 7, both petitions for review denied October 7, 1997 (326 Or 62)

BERGER FARMS,
an Oregon partnership;
Keith A. Berger; Kenneth A. Berger;
Rebecca Berger; Steven Berger,
*Respondents,*

*v.*

FIRST INTERSTATE BANK OF OREGON, N.A.,
a national banking association,
*Appellant.*

(9509-06466; CA A91677)

939 P2d 64

34

Thomas W. Sondag argued the cause for appellant. With him on the briefs was Lane Powell Spears Lubersky LLP.

James T. Massey argued the cause for respondents. On the brief were N. Robert Stoll, Keith A. Ketterling, Christine P. Hayes and Stoll Stoll Berne Lokting & Shlachter, P.C.

Before Riggs, Presiding Judge, and Landau and Leeson, Judges.

LEESON, J.

## LEESON, J.

Defendant, a national bank, appeals from two trial court orders that denied two motions it made pursuant to section 3 of the Federal Arbitration Act (9 USC §§ 1-16) to stay plaintiffs' action and refer their claims to arbitration. The issue is whether plaintiffs' claims fall within the scope of arbitration agreements among the parties. We vacate the second order and affirm in part and reverse in part the first order.

The arbitration agreements at issue are contained in two loan agreements and three continuing unconditional guarantees between defendant First Interstate Bank of Oregon and plaintiffs Berger Farms, a general partnership, and Keith, Kenneth, Rebecca and Steven Berger, its general partners. The first loan agreement, between Berger Farms and defendant, was executed on June 19, 1992, to provide funds for the continuing operations of plaintiffs' seed growing business.[1] The second loan agreement, between Berger Farms and defendant, was executed on March 11, 1994, to provide funds for the refinancing of previous farm production loans and for continuing operations. The three continuing unconditional guarantees, between Kenneth Berger and defendant, Keith and Rebecca Berger and defendant, and Steven Berger and defendant, also were executed on March 11, 1994, "in consideration of the granting of credit to [plaintiffs] by [defendant]." (Emphasis omitted.) The loan agreements and the guarantees contain mandatory arbitration agreements, which provide, in part:

"[ ] MANDATORY ARBITRATION OF ALL DISPUTES

"[ ] Binding Arbitration. All disputes arising out of or in connection with or related to this Agreement[/Guaranty] or any related agreements or instruments or any transaction of which this Agreement[/Guaranty] is a part *shall be resolved by binding arbitration in accordance with Title 9 of the United States Code* and the then effective Commercial Arbitration Rules of the American Arbitration Association.

---

[1] The parties executed an amended loan agreement on September 1, 1993. The amended loan agreement is identical in all relevant respects to the June 19, 1992, loan agreement.

"[ ] 'Dispute' is defined to mean any action, demand, dispute, claim, counterclaim or controversy between [the parties] whether in contract, tort, arising out of statute, or otherwise." (Emphasis altered.)

In September 1995, plaintiffs sued defendant for "forging and filing financing statements and * * * making misrepresentations regarding a loan never entered into by the parties." Pursuant to the arbitration agreements, defendant moved to stay the action pending arbitration, as provided by section 3 of the Federal Arbitration Act (FAA):

"If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration." 9 USC § 3.

While defendant's motion was pending, plaintiffs filed a first amended complaint. Shortly thereafter, the trial court issued an order denying defendant's motion to stay the action pending arbitration. After the court issued that order, and in response to the first amended complaint, defendant made a second motion pursuant to section 3 of the FAA to stay the action pending arbitration. Defendant then filed a notice of appeal from the trial court's order. Subsequently, the trial court issued a second order, denying defendant's second motion to stay. Defendant amended its notice of appeal to include that second order.

■     Defendant assigns error to both trial court orders. Before we can address those assignments of error, however, we must consider whether we have jurisdiction.[2] *See Emmert*

---

[2] After the trial court denied defendant's motions to stay litigation pending arbitration, defendant, pursuant to ORS 19.034(3), moved in this court for a summary determination that the trial court's orders are appealable under section 16(a)(1)(A) of the FAA. Shortly thereafter, pursuant to ORS 19.034(1), plaintiff moved in the trial court for a summary determination that the orders are not appealable. The Chief Judge of the Court of Appeals issued an order granting defendant's motion and determining that we had jurisdiction to decide defendant's

*Industrial Corp. v. Douglass*, 130 Or App 267, 269, 881 P2d 827, *rev den* 320 Or 325 (1994) (court's first inquiry is whether order appealed from is appealable, even if neither party raises question). For the reasons that follow, we conclude that we have jurisdiction under section 16(a)(1)(A) of the FAA, which provides that "[a]n appeal may be taken from * * * an order * * * refusing a stay of any action under section 3 of this title."

When federal claims are brought in state courts, "state courts are bound to follow federal substantive law but are free to follow their own practices as to matters which are strictly procedural." *Geris v. Burlington Northern, Inc.*, 277 Or 381, 383, 561 P2d 174 (1977); *see also Felder v. Casey*, 487 US 131, 138, 108 S Ct 2302, 101 L Ed 2d 123 (1988) (recognizing that states may establish procedural rules governing litigation in their own courts). State courts, however, may not follow state procedural laws that "undermine the goals and policies" of federal substantive law. *Volt Info. Sciences v. Stanford Univ.*, 489 US 468, 477-78, 109 S Ct 1248, 103 L Ed 2d 488 (1989) (State law is preempted to the extent that it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." (quoting *Hines v. Davidowitz*, 312 US 52, 67, 61 S Ct 399, 85 L Ed 581 (1941))); *see also Nutbrown v. Munn*, 311 Or 328, 341, 811 P2d 131 (1991), *cert den* 502 US 1030, 112 S Ct 867, 116 L Ed 2d 773 (1992) (state may impose procedural requirements that do not offend federal law); *Rogers v. Saylor*, 306 Or 267, 284, 760 P2d 232 (1988) (United States Constitution prohibits limitations of federal rights in state courts). We have said that Oregon and federal law suggest that the timing of the exercise of the right to appeal under section 16 of the FAA is a procedural matter. *Marr v. Smith Barney, Harris Upham & Co., Inc.*, 116 Or App 517, 523-24, 842 P2d 801 (1992), *rev den* 315 Or 442 (1993); *see Volt*, 489 US at 476 ("There is no federal policy favoring arbitration under a certain set of procedural rules; the federal policy is simply to ensure the

---

appeal. The trial court also determined that the orders were appealable. Neither party challenges those jurisdictional orders. We need not determine whether either of those orders constitutes a valid summary determination pursuant to ORS 19.034, because we must consider our own jurisdiction in every appeal.

enforceability, according to their terms, of private agreements to arbitrate."); *see also Pacific Reinsurance v. Ohio Reinsurance*, 935 F2d 1019, 1022 (9th Cir 1991) (by denying interlocutory appeals from orders to arbitrate, section 16 addresses remedies and procedures but does not alter substantive rights); *Nichols v. Stapleton*, 877 F2d 1401, 1403 (9th Cir 1989) (same). Consequently, we follow Oregon law regarding appealability, unless that law undermines the goals and policies of the FAA.

■ Arbitration under the FAA is a special statutory proceeding. *See Peter Kiewit v. Port of Portland*, 291 Or 49, 63, 628 P2d 720 (1981) (proceedings under Oregon arbitration statutes are special proceedings). Consequently, ORS 19.010(4) governs appeals from trial court orders denying motions made pursuant to section 3 of the FAA. ORS 19.010(4) provides that

> "[a]n appeal may be taken from the circuit court in any special statutory proceeding under the same conditions, in the same manner and with like effect as from a judgment, decree or order entered in an action or suit, unless such appeal is expressly prohibited by the law authorizing such special statutory proceeding."

The Supreme Court has ruled that "ORS 19.010(4), by its analogy to appeals in other cases from circuit court, requires a final and complete determination of the matter in the special proceeding before an appeal is appropriate." *Dept. of Rev. v. Universal Foods Corp.*, 311 Or 537, 544, 815 P2d 1237 (1991). Moreover, ORS 19.010(2)(a), which spells out the conditions under which an appeal may be taken from a prejudgment order in an action or suit, provides for an appeal only from "[a]n order affecting a substantial right, and which in effect determines the action or suit so as to prevent a judgment or decree therein." In this case, whether or not the trial court's orders affect defendant's substantial rights, they do not determine the action so as to prevent a final judgment: a final judgment will be entered at the conclusion of the litigation. Consequently, the trial court's orders are not appealable under Oregon procedural law. That conclusion does not end our inquiry, however, because, as noted above, if ORS 19.010(4) undermines the goals and policies of the FAA, we cannot follow that state law. *Volt*, 489 US at 477-78.

■ The basic objective of the FAA is to ensure that commercial arbitration agreements are enforced according to their terms. *First Options of Chicago, Inc. v. Kaplan*, 514 US 938, 947, 115 S Ct 1920, 1925, 131 L Ed 2d 985 (1995). To secure that objective, section 16 of the FAA generally *prohibits* appeals from trial court orders that favor arbitration over litigation and *permits* appeals from orders that favor litigation over arbitration. 9 USC § 16; *see Marr*, 116 Or App at 523 ("[L]egislative history and the sense of the statutory scheme indicate that Congress intended to prevent interlocutory appeals from orders that favor arbitration over litigation." (emphasis omitted)). Not surprisingly, section 16 expressly provides for immediate appeals from trial court orders denying motions to stay litigation pending arbitration.

Conversely, Oregon procedural law prohibits such appeals. ORS 19.010(2)(a), (4). By prohibiting such appeals, Oregon's procedural law razes the framework with which the FAA secures its basic objective. By foreclosing the right to an immediate appeal from an order denying a stay of litigation pending arbitration, Oregon law permits a nonmoving party to skirt an otherwise valid arbitration clause and to force the moving party into potentially lengthy and costly litigation. That undermines the basic objective of the FAA, namely, to ensure that valid arbitration clauses are enforced according to their terms. Where a state procedural law, like ORS 19.010(4),

"is inconsistent in both purpose and effect with the * * * objectives of the federal * * * law, * * * [p]rinciples of federalism, as well as the Supremacy Clause, dictate that such a state law must give way to vindication of the federal right when that right is asserted in state court." *Felder*, 487 US at 153.

Consequently, the FAA controls our jurisdiction. Section 16 of that act provides that the trial court's orders are appealable.

■■ Although the trial court's orders are appealable, we must answer one additional question: whether the stay provision of section 3 of the FAA, pursuant to which defendant made its motions, applies in Oregon courts. When construing federal statutes, we start with the language of the statute

and its placement and purpose in the statutory scheme. *Bailey v. United States*, 516 US ___ , ___ , 116 S Ct 501, 506-07, 133 L Ed 2d 472 (1995). Section 3 refers to "any of the courts of the United States." That broad textual reference includes both state and federal courts. The context of the FAA supports that conclusion: While section 3 refers to "any of the courts of the United States," section 4 refers to "United States district court[s]." 9 USC §§ 3, 4. Inclusion of the phrase "district court" in section 4, and omission of that same qualifying language in section 3, indicates that Congress intended section 3 to apply in state courts. *See Russello v. United States*, 464 US 16, 23, 104 S Ct 296, 78 L Ed 2d 17 (1983) ("where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion").

Furthermore, the United States Supreme Court has recognized that "state courts, as much as federal courts, are obliged to grant stays of litigation under § 3 of the Arbitration Act," because "Congress can hardly have meant that an agreement to arbitrate can be enforced against a party who attempts to litigate an arbitrable dispute in federal court, but not against one who sues on the same dispute in state court." *Moses H. Cone Hospital v. Mercury Constr.*, 460 US 1, 26, 26 n 34, 103 S Ct 927, 74 L Ed 2d 765 (1983). The Court further has noted that "the state courts have almost unanimously recognized that the stay provision of § 3 applies to suits in state as well as federal courts." *Id.*; *see also* Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3569 (2d ed 1984) (concluding that section 3 applies in state courts). *But see Volt*, 489 US at 477 n 6 (professing to leave unanswered question whether section 3 applies in state courts). We conclude that section 3 applies in Oregon courts and therefore turn to the merits of defendant's appeal.

■    Defendant assigns error to the two trial court orders denying a stay of plaintiffs' action pending arbitration. We address the second order first. Defendant argues that the trial court's second order is void, because when defendant filed the notice of appeal from the first order, the trial court lost jurisdiction to issue the second order. Plaintiffs concede

that the trial court was without jurisdiction to issue the second order. We accept that concession, because "once a notice of appeal has been filed, the appellate court has jurisdiction and the trial court does not, until there is a final determination on the merits or a determination that the appellate court lacks jurisdiction." *Murray Well-Drilling v. Deisch*, 75 Or App 1, 9, 704 P2d 1159 (1985), *rev den* 300 Or 546 (1986) (emphasis omitted); *see also* ORS 19.033(1) (delineating jurisdictional effect of appeal); *Ellis v. Roberts*, 302 Or 6, 9, 725 P2d 886 (1986) (pendency of appeal deprives trial court of authority to make substantive rulings).

■ ■    We turn to the first order, which we review for errors of law. *See Dean Witter Reynolds, Inc. v. Byrd*, 470 US 213, 218, 105 S Ct 1238, 84 L Ed 2d 158 (1985) (by its terms, FAA leaves no place for exercise of discretion by district court). The law we apply is the FAA (9 USC §§ 1-16), because the arbitration agreements provide for resolution of covered disputes "in accordance with Title 9 of the United States Code." Section 2 of the FAA provides that

> "[a] written provision in * * * a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction * * * shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."

The parties do not dispute the validity or enforceability of either of the loan agreements or any of the continuing unconditional guarantees that contain the arbitration agreements.[3] According to defendant, the trial court erred in issuing the first order, because all of plaintiffs' claims fall within the scope of the arbitration agreements:

> "Each of plaintiffs' claims presents a dispute related to the 1992 or 1994 loan agreements, an agreement or instrument related to at least one of those agreements, or a transaction of which at least one of those agreements is a part."

---

[3] Relying solely on state law, however, plaintiffs argue that the arbitration agreements are "overbroad and void because [they are] against public policy." That argument is without merit, because the validity and scope of the arbitration agreements in this case are matters of federal law. Federal law preempts any conflicting state law. *Southland Corp. v. Keating*, 465 US 1, 13, 104 S Ct 852, 79 L Ed 2d 1 (1984).

Plaintiffs respond that their claims fall outside the scope of the arbitration agreements and that the trial court therefore properly denied defendant's first motion to stay:

> "The two separate aspects of plaintiffs' involvement with the defendant can be characterized as follows: 1) a lending relationship between plaintiff Berger Farms and defendant involving consummated loan agreements and related documents signed by one or more of the plaintiffs; and 2) loan agreements that were never consummated and documents that were never authorized or signed by the plaintiffs, but rather forged by the defendant. Plaintiffs' claims in this lawsuit are based on this second aspect, relating not to plaintiffs' banking relationship with defendant, but to forgeries and misrepresentations which were unauthorized and wholly outside of the scope of such relationship." (Footnote omitted.)

Plaintiffs also respond that even if Berger Farms' claims fall within the scope of the arbitration agreements, the individual partners' claims do not.

In defining the scope of an arbitration agreement, the rule under the FAA is that

> " 'questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration. * * * The Arbitration Act establishes that, as a matter of federal law, *any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration * * *.*' " *Mitsubishi Motors v. Soler Chrysler-Plymouth*, 473 US 614, 626, 105 S Ct 3346, 87 L Ed 2d 444 (1985) (quoting *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 US 1, 24-25, 103 S Ct 927, 74 L Ed 2d 765 (1983)) (emphasis supplied).

*See, e.g., United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 US 574, 582-83, 80 S Ct 1347, 4 L Ed 2d 1409 (1960) ("An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."). Accordingly, plaintiffs' claims fall within the scope of the arbitration agreements unless we can say with positive assurance that the claims do not "aris[e] out of or in connection with or relate[ ] to [the loan] Agreement[/Guaranty] or any related agreements or instruments

or any transaction of which this Agreement[/Guaranty] is a part." The parties must arbitrate any claims that fall within the scope of the arbitration agreements, even though piecemeal litigation might result. *See Dean Witter Reynolds, Inc.*, 470 US at 220-21 (courts must rigorously enforce arbitration agreements even if piecemeal litigation results).

Plaintiffs make seven claims for relief in their first amended complaint. In determining whether those claims fall within the scope of the arbitration agreements, we look only at plaintiffs' first amended complaint, *see Klemgard et al v. Wade Seed Co.*, 217 Or 409, 414, 342 P2d 757 (1959) ("[A] pleading loses its status as such when it is superseded by an amended one."); *Wagner v. Ryder Truck Lines*, 70 Or App 420, 423, 689 P2d 1030 (1984) (superseded complaint may not be read in conjunction with amended complaint to serve as basis for motion to dismiss for failure to state claim, but rather court may look only to facts alleged in amended complaint), and at the affidavits supporting and opposing defendant's first motion to stay, *see* 9 USC § 6 (application for stay under FAA shall be made and heard in manner provided by law for making and hearing of motions).

Plaintiffs' first claim is for breach of fiduciary duty. They allege that defendant made the June 19, 1992, loan "on an unsecured basis" accompanied by an "oral contract that it would not seek a security interest in plaintiffs' real property, products or proceeds." Nevertheless, plaintiffs allege, without authorization and by forging Kenneth Berger's signature, defendant filed several UCC-1 and UCC-1A financing statements in an "attempt[ ] to gain a security interest in plaintiffs' property, products or proceeds." Plaintiffs further allege that defendant breached its fiduciary duty by "its denial, in bad faith, of the fact that Kenneth Berger did not sign the UCC financing statements."

The UCC financing statements covered the following collateral and the products and proceeds therefrom:

"[Plaintiffs], as borrower[s], do[ ] hereby agree and pledge not to encumber or mortgage (other than to [defendant]), sell, transfer or trade real property, now owned, during the time which [plaintiffs are] indebted to [defendant] * * *

without prior written consent from [defendant]. *This agreement and pledge cover[ ] all real property* with improvements thereon *owned by [plaintiffs]* wherever situated. *Dated June 19, 1992.*"[4] (Emphasis altered.)

The June 19, 1992, loan agreement contained the following "Negative Agreements" provision:

"4. NEGATIVE AGREEMENTS. [Plaintiffs] agree[ ] that while this Agreement is in effect, [Plaintiffs] shall not, without the prior written consent of [Defendant]: (a) Dispose of any of [Plaintiffs'] assets except in the regular course of business; (b) Incur indebtedness for borrowed money or mortgage or encumber any of [Plaintiffs'] assets or sell with recourse any of [Plaintiffs'] receivables, except to [Defendant], or execute any financing statement in which anyone other than [Defendant] is named as the secured party; * * * (g) *Other: See negative pledges dated June 19, 1992.*" (Emphasis altered.)

■ Plaintiffs' allegation that defendant made the June 19, 1992, loan on an unsecured basis and promised not to seek a security interest in plaintiffs' real property, products or proceeds clearly relates to plaintiffs' allegation that defendant attempted to perfect just such a security interest by way of the UCC financing statements. The UCC financing statements, in turn, describe as collateral an agreement and pledge dated June 19, 1992, and the June 19, 1992, loan agreement expressly refers to negative pledges that also are dated June 19, 1992. Plaintiffs concede on appeal that the "negative pledge, which was part of the June 19, 1992, loan agreement, was attached to or made part of the forged financing statements."[5] We therefore cannot say with positive assurance that plaintiffs' claim for breach of fiduciary duty

---

[4] The precise description of the covered collateral varies slightly among the financing statements, depending on whether the particular financing statement names Berger Farms, the partnership or one of the individual general partners. We do not address what, if any, security interest may have been perfected by defendant's filing.

[5] Because the trial court record relating to defendant's first motion to stay does not contain any copies of the June 19, 1992, negative pledges, we cannot consider those pledges in reviewing the trial court's order denying defendant's first motion to stay. We have vacated the trial court's second order for lack of jurisdiction. Consequently, with respect to that order, we need not consider the negative pledges and note only that they are in the trial court record relating to defendant's second motion to stay.

based on the UCC financing statements does not "aris[e] out of or in connection with or relate[ ] to [the June 19, 1992, loan] [a]greement * * * or any transaction of which [that loan] [a]greement is a part." Consequently, the trial court erred in ruling that plaintiffs' breach of fiduciary duty claim based on the theory that defendant forged and filed the UCC financing statements falls outside the scope of the arbitration agreement contained in the June 19, 1992, loan agreement.

■ Plaintiffs also claim, however, that defendant breached its fiduciary duty by misrepresenting to them that it would make a construction loan for a new seed plant. Plaintiffs allege that in March 1993 they started looking for construction financing for a new seed plant and that defendant "told [plaintiffs] to discontinue talks with other lenders, because [defendant] wanted to do all of [plaintiffs'] financing and take care of all of [plaintiffs'] credit needs" and that defendant "would do the construction loan financing." Defendant never made a seed plant construction loan to plaintiffs. The June 1992 and March 1994 loan agreements, and the March 1994 continuing unconditional guarantees, make no reference to construction financing. Neither does any related agreement, instrument or transaction. Based on the limited trial court record on review, we can say positively that plaintiffs' claim for breach of fiduciary duty based on misrepresentations concerning a construction loan falls outside the scope of the arbitration agreements. Consequently, the trial court did not err in denying defendant's motion to stay with respect to the misrepresentation theory of plaintiffs' first claim for relief.

■ Plaintiffs' second claim for relief is that defendant negligently misrepresented that it would provide the construction financing for the seed plant. Defendant argues that the misrepresentation claim must be arbitrated, because it

"relies on an alleged 'special relationship' between plaintiffs and defendant, one created by and based on the parties' banking relationship. That banking relationship is founded on the borrowing and lending of money through lines of credit. As such, any claim based on that relationship is related to the contracts establishing the lines of credit, including the June 1992 and the March 1994 loan agreements." (Citations omitted.)

As noted above, the June 1992 and March 1994 loan agreements and the March 1994 continuing unconditional guarantees make no reference to construction financing. Based again on the limited trial court record on review, plaintiffs' second claim for relief falls outside the scope of the arbitration agreements, and the trial court did not err in denying defendant's motion to stay with respect to that claim.

■ Plaintiffs' five remaining claims all relate to defendant's alleged oral contract not to seek a security interest in plaintiffs' real property, products or proceeds, and to the UCC financing statements. The UCC financing statements and the alleged oral contract all relate to the June 19, 1992, loan agreement. Consequently, all of those claims fall within the scope of the arbitration agreements, and the trial court erred in denying defendant's motion to stay with respect to those claims.

■■ Finally, we consider plaintiffs' contention regarding all seven claims that "[o]nly plaintiff Berger Farms is a party to the two loan agreements and accordingly only plaintiff Berger Farms is subject to the arbitration clauses contained within those agreements" and that "[t]he individual plaintiffs cannot be compelled to arbitrate any of the disputes." Plaintiffs are mistaken in both law and fact. By law "all partners are liable * * * [j]ointly for all * * * debts and obligations of the partnership." ORS 68.270(1). An individual partner may not sue alone on a cause of action belonging to the partnership. *Marx v. Lenske / Krause*, 263 Or 90, 95, 500 P2d 715 (1972). Consequently, Keith, Kenneth, Rebecca and Steven Berger, the individual general partners, are bound by the same arbitration agreements that bind Berger Farms, the general partnership.

■ Furthermore, by executing the March 11, 1994, guarantees, all of the individual general partners "unconditionally guarantee[d] to [defendant] * * * payment * * * of any and all Indebtedness of [plaintiff Berger Farms] to [defendant]." Those guarantees use the term "Indebtedness" "in its most comprehensive sense" to mean "any and all indebtedness of every kind and nature for which [plaintiff Berger Farms] may now be indebted or may in the future become indebted to [defendant]." Accordingly, those guarantees,

which contain arbitration agreements, necessarily relate to both the June 19, 1992, loan agreement, a preexisting debt, and the March 11, 1994, loan agreement, a concurrent debt. Factually, therefore, all of the individual partners' claims relating to either loan agreement or to the continuing unconditional guarantees fall within the scope of the arbitration agreements.

Second order vacated; first order affirmed in part and reversed in part. Remanded to trial court to rule on defendant's second motion to stay under 9 USC § 3.